# IN THE COURT OF APPEALS OF IOWA

No. 20-1008
Filed November 30, 2020

**IN THE INTEREST OF A.M.,**
**Minor Child,**

**D.M., Father,**
    Appellant.

_____

Appeal from the Iowa District Court for Johnson County, Deborah Farmer
Minot, District Associate Judge.

A father appeals an order terminating his parental rights.  **AFFIRMED.**

Joseph C. Pavelich, Iowa City, for appellant father.

Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant
Attorney General, for appellee State.

Anthony A. Haughton of Linn County Advocate, Inc., Cedar Rapids, attorney
and guardian ad litem for minor child.

Considered by Mullins, P.J., and May and Schumacher, JJ.

**SCHUMACHER, Judge.**

A father appeals an order terminating his parental rights with respect to his one-year-old daughter, A.M.[1]  He alleges error by the district court in ordering a termination of parental rights as opposed to establishing a guardianship.  He also argues a denial of reasonable efforts during the course of the underlying child in need of assistance (CINA) proceeding due to modification of visitation following the outbreak of the COVID-19 pandemic.  We find termination of the father's parental rights is the appropriate permanency option for A.M.  Although error was unpreserved on the father's reasonable-efforts argument, we address such argument in light of the COVID-19 pandemic concerns raised by the father.  However, we find his argument to be without merit.  Accordingly, we affirm.

## I. Facts and Prior Proceedings

The Iowa Department of Human Services (DHS) became involved with newborn A.M. on June 11, 2019, as a result of her umbilical cord testing positive for marijuana.  In the week following this test, a second report was received by DHS, alleging A.M.'s parents were using and dealing drugs around the baby.  Shortly after A.M.'s birth, the father was incarcerated, and the mother left A.M. in the care of A.H., the child's maternal great-aunt.

DHS again became involved with A.M. on June 27, after a search warrant was executed on the parents' apartment, resulting in possession of drugs and paraphernalia charges against the mother.  A DHS worker met with both parents and explained the removal process.  Both parents expressed a willingness to

---

[1] The mother's rights were also terminated.  She does not appeal.

cooperate. A order was entered removing A.M. from her parents' custody and placing her custody with DHS. A.M. was placed with her maternal great-aunt. On July 3, the placement reported that when she took A.M. for a visit with the parents, they became angry and threatening toward the placement. As a result, all future visits were required to be supervised by a DHS or Family Safety, Risk, and Permanency (FSRP) provider.

A removal hearing was held on July 5, where both parents stipulated to continued removal and adjudication of A.M. as a CINA. A.M. was adjudicated CINA on the same date, pursuant to Iowa Code sections 232.2(6)(c)(2), (n), and (o) (2019). An FSRP provider met with the parents to arrange visits. The parents refused hair-stat drug testing, indicating it was against their religion, and requested other forms of testing. DHS arranged for alternate testing, including urinalyses and drug-patch testing. The parents also agreed to complete substance-abuse and mental-health evaluations.

Through July and August, visits were provided through Families, Inc. Both parents attended most visits and demonstrated a basic ability to care for A.M. However, during this same time period, both parents tested positive for marijuana and PCP. Following the receipt of these positive test results, the parents stopped complying with drug testing and began to complain about the placement's care of the child. The parents also began to deny reasons existed for the initial removal. At a dispositional hearing on September 5, the parents asked the court to place A.M. in foster care rather than remaining with a relative. A.M. was moved to a foster home.

By the end of October, the parents were becoming more resistant to services provided by DHS and increasingly agitated with the reunification efforts. At a visit on November 6, when the FSRP provider gave the father parenting suggestions, he became visibly angry and argumentative. A DHS worker arrived to observe the visit and arrange for both parents to begin substance-abuse treatment. The parents continued arguing, using vulgar language in the presence of A.M.

On November 7, the father sent a threatening text to the FSRP provider prompting DHS to move all visits to the DHS office and provide the father a warning letter. After this, both parents' cooperation dramatically decreased. The parents frequently arrived late or cancelled visits. Both parents demonstrated disrespectful and threatening behavior toward DHS and FSRP providers. Visits were suspended in January 2020 after the parents became assaultive and aggressive during a scheduled visitation at the DHS office.[2] Law enforcement was required to be called. A meeting was scheduled to discuss the behavioral changes that needed to occur to restart visits. Neither parent attended the meeting.

On January 21, an in-court review was held, and the mother asked that A.M. be returned to the maternal great-aunt's care. At this hearing, both parents' attorneys requested to withdraw, citing differences about how the case should proceed. The motions to withdraw were granted. On January 30, the State filed

---

[2] Both parents were verbally aggressive with workers. The father left the visitation room and was able to access the office area of DHS. The mother threw a chair down the hallway, tore a bulletin board off the wall, knocked a sign off the wall, and threw a lid from a recycling bin down a hallway.

a petition to terminate parental rights. A.M. remained in DHS custody, but her placement was moved back to her maternal great-aunt on February 21.

Throughout February, DHS and FSRP attempted to contact the parents to schedule a safety meeting as required by the court. The parents did not respond. While the termination hearing was originally set for March 8, the court continued the hearing at the parents' request to provide additional time to locate counsel.[3] The court also ordered DHS to provide in-home and at-work drug testing as the parents stated it was hard for them to comply with testing because of their schedules. The parents also signed a safety plan and provided their work schedules so they could resume visits. The dispositional order was modified, with custody of A.M. placed with the relative placement on April 29.

The parents' cooperation was short-lived. While they displayed good skills and behavior at the first resumed visit, the parents' behavior again worsened as they became threatening toward A.H.[4] At the conclusion of supervised video visits, the parents would call A.H. and demand to see A.M. without the FSRP provider present. This resulted in a no-contact order being entered on May 23 between the parents and A.H. except during supervised visits.

A combined permanency and termination hearing was held on July 5. Neither parent appeared for the hearing. Both parents submitted affidavits in lieu of live testimony. The father's affidavit did not raise an issue concerning reasonable efforts surrounding visitation but rather requested that guardianship of

---

[3] A record was made of the parents' request to have the same attorney appointed to represent both of their interests.

[4] The week following the first resumed visitation, the DHS building closed as a result of the COVID-19 pandemic.

A.M. be placed with her current placement, A.H.[5] The case manager testified her recommendation for termination derived, in part, from the parents' instability, volatile relationship, and substance-abuse issues. The district court terminated the father's parental rights on July 16, pursuant to Iowa Code section 232.116(1)(h) (2020). The father does not contest the statutory ground relied on by the district court.

## II. Standard of Review

A review of a termination of parental rights is de novo. *In re A.S.*, 906 N.W.2d 467, 472 (Iowa 2018). "We are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses." *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010).

## III. Analysis

### A. The father's request for a guardianship as a permanency option.

The father first contends the district court should have established a guardianship with the current placement instead of terminating his parental rights. We begin with the principle that "a guardianship is not a legally preferable alternative to termination." *A.S.*, 906 N.W.2d at 477 (quoting *In re B.T.*, 894 N.W.2d 29, 32 (Iowa Ct. App. 2017)). Although section 232.104(2)(d) allows for

---

[5] In part, the father's one-page affidavit accepted responsibility for his actions during the CINA case, stating:

> I take full responsibility for what I have or have not done. There was a choice I had to make with myself and that was either my daughter alone or protect and stand beside my wife and be her rock. Well, the choice was clear and although this was a terribly hard decision to make I do believe [A.M.] is in great care but it is my wife who needs me now more th[a]n ever. I understand that in making this decision that it completely withdraws my ability to be a father at this moment.

the establishment of a guardianship as a permanency option, section 232.104(3) requires "a judicial determination that [such a] planned permanent living arrangement is the best permanency plan for the child." *See B.T.*, 894 N.W.2d at 32–33.

Determining the best permanency plan for a child is a best-interests assessment. A.M. is very young. A guardianship, rather than termination, would not promote stability or provide permanency to this young child's life. *See In re R.S.R.*, No. 10-1858, 2011 WL 441680, at *4 (Iowa Ct. App. Feb. 9, 2011) ("So long as a parent's rights remain intact, the parent can challenge the guardianship and seek return of the child to the parent's custody."). Guardianships can inherently be changed or terminated. *See A.S.*, 906 N.W.2d at 477–78.

Cognizant of this issue, the district court found:

A guardianship cannot possibly meet [A.M.'s] need for permanency. A guardianship is, by its very nature, impermanent. A guardian has no parental authority, she has only the power granted by a court. Parental rights remain intact, allowing parents to intervene and interfere in decisions about school, medical treatment, and other matters. Parents have the right to seek to overturn a guardianship, or replace the guardian, possibly with the assistance of court-appointed counsel, placing the guardian in the position of having to hire an attorney. Any of these scenarios could place a child in the middle of a tug-of-war between her guardian and her parents that could last for years, possibly throughout her childhood. More importantly, a guardian is required by law to regulate the relationship between a child and her parents. It has been conclusively established over the past year that these parents do not respect [the placement], they do not accept that she has any authority with respect to [A.M.], and they verbally abuse, insult, and threaten her. There is every reason to believe that the parents will resist and defy any conditions set by a guardian and any orders entered in a guardianship case, just as they have done over the past year in the child in need of assistance case.

Upon our de novo review, we agree with the district court that termination of parental rights is the best permanency option for A.M.

### B. Reasonable efforts for reunification.

The father also contends he was not provided reasonable efforts toward reunification in light of the COVID-19 pandemic with regard to visitation. We initially note the father did not preserve this argument. "[T]he general rule that appellate arguments must first be raised in the trial court applies to CINA and termination of parental rights cases." *In re A.B.*, 815 N.W.2d 764, 773 (Iowa 2012). The father did not raise this issue before the district court.

However, given the extraordinary circumstances of the pandemic, we nevertheless address the issue in light of the COVID-19 related visitation restrictions. "The court's determination regarding continuation of the child in the child's home, and regarding reasonable efforts . . . must be made on a case-by-case basis." Iowa Code § 232.102(4)(b). We have evaluated reasonable efforts in light of COVID-19 in the recent past. *See, e.g.*, *In re D.W.*, No. 20-0725, 2020 WL 5946093, at *2 (Iowa Ct. App. Oct. 7, 2020) (looking at reasonable efforts over the entire DHS involvement and not just the most recent month); *In re B.S.*, No. 20-1071, 2020 WL 5946405, at *3 (Iowa Ct. App. Oct. 7, 2020) (determining reasonable efforts focus on the safety of the child and finalizing a permanency plan in a timely manner, and that if COVID-19 did not prevent participation in services, reasonable efforts were offered); *In re W.L.*, No. 20-0880, 2020 WL 5229199, at *1−2 (Iowa Ct. App. Sept. 2, 2020) (looking at parent's behavior prior to the COVID-19 pandemic to determine if an extension would have changed the potential outcome); *In re E.A.*, No. 20-0849, 2020 WL 4498164, at *2 (Iowa Ct. App. Aug. 5,

2020) (stating the court "will not delay permanency for the children simply because of unexpected changes in services"). We have previously held that when faced with the reasonable-efforts issue in light of the pandemic, we should look at the parent's engagement with the efforts that were offered prior to the pandemic. *E.A.*, 2020 WL 4498164, at *2. "Parents must adapt to unplanned situations and overcome unexpected challenges." *Id.*

The State's duty to make reasonable efforts encompasses a visitation arrangement "designed to facilitate reunification while protecting the child from the harm responsible for the removal." *In re M.B.*, 553 N.W.2d 343, 345 (Iowa Ct. App. 1996). Visitation, however, cannot be considered in a vacuum. It is only one element in what is often a comprehensive, interdependent approach to reunification. If services directed at removing the risk or danger responsible for a limited visitation scheme have been unsuccessful, increased visitation would most likely not be in the child's best interests. *Id.*

Prior to the pandemic, the father had ceased participation in the drug tests offered by DHS and was aggressive with providers and workers. He had not participated with drug testing for over eight months by the time of the termination hearing.[6] When the pandemic began, and visits were conducted through video conference, the parents would delay visits and attempt to work around the DHS supervision. After the outbreak of the pandemic, the parents were also offered visits outside, which they declined. The father failed to complete mental-health

---

[6] Between October 17, 2019, and June 11, 2020, the father failed to appear for a minimum of thirty-one drug tests.

and substance-abuse treatment. Looking at the comprehensive plan for reunification, we find DHS provided reasonable efforts to the father.

## IV. Conclusion

Termination of parental rights was the appropriate permanency option for A.M. Reasonable efforts for reunification were provided to the father. We affirm the termination order.

**AFFIRMED.**